Miller Rasmussen Ice & Coal Company and another, Appellants, vs. Industrial Commission and another, Respondents.

*March 6—March 31, 1953.*

For the appellants there were briefs by *Welsh, Trowbridge, Wilmer & Bills* of Green Bay, and oral argument by *Fred N. Trowbridge.*

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

FAIRCHILD, J.   While this court has recognized that the members of the Industrial Commission are expert triers of

fact and has "deferred to this expertness in situations involving an appraisal of the convincing power of expert testimony, and has sustained the power of the commission to reject it when contrary to the commission's expert knowledge on the subject," it is not to be understood, however, that we can or should abdicate this court's function of reviewing the record before the commission to ascertain whether there is evidence to support it. *F. A. McDonald Co. v. Industrial Comm.* 250 Wis. 134, 137, 26 N. W. (2d) 165. In the opinion in the case just cited, Mr. Justice WICKHEM said: "Carried to its logical conclusion, the contention of the commission would require such an abdication in all cases involving expert knowledge and opinion." The principles stated in the *McDonald Case* afford a guide to the solution of the problem now before us.

The following facts are before us: On September 18, 1945, Edwin A. Edwards was injured while in the employ of Miller Rasmussen Ice & Coal Company when he was squeezed between the fender of the truck he was working on and the back end of another truck pulling out of its parking place. The injury was minor, the only objective finding being abrasions on both hips. Edwards continued to work until October 6, 1945. Then followed intermittent periods of hospitalization, examination, treatment, and employment until December 5, 1946. Edwards did nothing by way of employment from December 5, 1946, until March 1, 1948, when the rehabilitation department set him up in a shoe-repair shop. He was fully examined by orthopedic specialists and psychiatrists. In addition, independent medical examinations were had on two separate occasions at the request of the commission, by Dr. Herman Wirka, orthopedist at the State of Wisconsin General Hospital; and also on two separate occasions psychiatric examinations were made by Dr. Mabel Masten, physician and professor of neuropsychiatry at the Wisconsin General Hospital. Five hearings were held before three different exam-

iners of the commission over a period of five years. The fifth and final hearing was held June 5, 1951. The commission made its own findings and issued its order of July, 1951, referred to in the statement of facts.

If the commission's finding of total disability is to be sustained, the reports of the psychiatrist, on which it is based, must show to a reasonable probability or certainty that the trauma of 1945 so upset Edwards' basic psychoneurotic personality that since September 18, 1945, he has been unable to perform any useful employment except for intermittent periods in 1945 and 1946.

The pertinent portions of Dr. Masten's report of 1947 in relation to her psychiatric examination of Edwards read as follows:

"His early years were marked by insecurity and lead to a conduct disorder. He has been in several penal institutions in the state of Illinois. He went on probation for his last offense in 1929. He was released from probation in 1932 and denies that there has been any subsequent misconduct. Two automobile thefts resulted in prison terms. Part of his early life was spent with grandparents, and for a time he was in an institution for dependent children, and from the age of fifteen years on he was on his own. He married at nineteen years and now has eight children. He had had many jobs and has always had trouble making an income adequate for his growing family.

". . . His attitude toward his disability and his future employability is not healthy. He accepts his condition as irremedial and is ready to allow his wife to take over the responsibilities for wage earning while he plans to take her place in the home. *He is an immature person.* These factors will make rehabilitation difficult. With no objective medical and social history, *I cannot make a definitive psychiatric diagnosis,* though I have no hesitation in saying that he is not psychotic and that *he is a neurotic type,* but without objective data I cannot call him a constitutional psychopath as the history of misconduct suggests. The negative X-ray studies do not confirm my original clinical impression of arthritis and

disc disease; however, the negative findings do not entirely rule out the disc disease for it is difficult to demonstrate a midline herniation which the bilateral radiation of pain in his legs suggests. I must admit, however, that the negative X-ray findings and *the poor personality structure favors a diagnosis of a psychoneurotic reaction to trauma.* I think we can say with safety that he is not malingering, though I know you appreciate that *on a scientific basis, the latter is a hard diagnosis to make either in the negative or in the positive."*

Dr. Masten's report dated January 29, 1951, contains the following opinion:

"Psychologic examination gave no evidence of psychotic disorder nor was there anything to explain his behavior on an organic basis. The Wechsler Bellevue intelligence test indicates an intelligence quotient of 122, which indicates superior intelligence. It became obvious that he is not making use of his native endowment and that he is operating under a severe handicap of psychoneurosis. *His early social history suggests constitutional inadequacy. Emotional immaturity and dependency appear to have rendered him unfit to face the responsibility of his growing family* consisting of wife and nine children. The accident has provided a *defense* against facing the demands of reality. *There may be some degree of malingering.* This commonly exists in many psychoneurotic traumatic reactions, but *primarily his condition is the result of personality disorder and neurotic behavior. . . ."*

Analyzing the 1947 report, we find that Dr. Masten was "unable to make a definitive psychiatric diagnosis," although in broad terms the report states that applicant is a "neurotic type." Later she says that she can say "with safety that he is not malingering," but she immediately adds that "on a scientific basis, the latter is a hard diagnosis to make either in the negative or in the positive." The statement that claimant's poor personality structure "favors a diagnosis of psychoneurotic reaction to trauma" points merely to a possibility, and there is no statement in the report which with reasonable

certainty or probability states that Edwards was suffering from *traumatic* psychoneurosis.

In the report of 1951 Dr. Masten emphasizes applicant's psychoneurosis, emotional immaturity and dependency, and his early social history suggesting constitutional inadequacy. The only mention made of psychoneurotic *traumatic* reactions is in a general statement that malingering commonly exists in such cases. She does not associate Mr. Edwards with traumatic psychoneurosis, but says that "his condition is the result of personality disorder and neurotic behavior beyond his understanding." She does not say that such neurotic behavior was due to trauma. The report shows and the record shows that applicant had trouble facing the demands of reality long before the accident occurred, and there is nothing to show to a reasonable certainty or probability that malingering was not behind the claimant's using the accident as a "defense against facing the demands of reality," and it is admitted in this report that "there may be some degree of malingering."

On consideration of the two above reports, we find that uncertainties so completely predominate that it is understandable that no basis has been found for an opinion as to a reasonable certainty of trauma causing applicant's maladjustment. As said in *F. A. McDonald Co. v. Industrial Comm., supra,* with respect to the medical report there (p. 137) : "[It] is nothing more than a statement that there *might* be a . . . total disability having a causal relation to the accident. This is addressed to the possibilities and not the probabilities of the situation. . . . So far as the commission's finding of permanent disability is based upon the medical report . . . , it must be considered to be just as speculative as the report itself."

Other testimony which supports a finding of malingering is that of Dr. Wirka and Dr. James R. Hurley, a specialist in psychiatry and neurology. In his 1951 report, Dr. Wirka

says: "There is no orthopedic problem in this man so far as I can see. He almost borders on malingering." Dr. Wirka's account of the examination points to malingering where he says: "On orthopedic examination the gait was not typical of any bone or joint lesion. *The gait did not appear real.* The gait changed frequently and as often as possible in the distance covered on the request of walking. The limp changed from one leg to the other." Dr. Hurley testified that in his opinion a diagnosis as to Edwards rests "between the syndrome called hysteria, or neurosis and malingering, or a constitutional psychopathic personality" but that "the greater probability lies in malingering." ·

We, therefore, have a case where applicant's complaints are entirely subjective, with no pathological basis according to orthopedists who examined him, and where examination by psychiatric experts have produced no credible evidence with sufficient positiveness to attribute claimant's psychoneurotic condition to the slight trauma he received in September, 1945.

Before it may decide to make an award, the commission must be convinced by substantial evidence. It is not too high a test to require, in treating with expert testimony that evidence, to some degree of reasonable certainty, of a relation between an injury and a result be shown by a competent opinion. This seems to be necessary to avoid resting decisions on possibilities and leaving a result based on speculation and conjecture instead of basing decisions on proof which satisfies the mind of the existence of this essential relationship. Especially is this true if we are to continue to have the rights of all parties involved protected under administrative procedure and avoid arbitrary decisions.

The contention put forth by the attorney general that the commission may disregard the medical testimony and find a permanent disability from the fact that (1) there were no pains before the accident; (2) that applicant sustained an

injury resulting in pain; and (3) that subjective symptoms persisted after a considerable treatment is not sustainable. "This inference is not sustainable on the basis of common or general knowledge, and is contrary not only to all the medical opinion in the case, but to all of the medical findings based on actual physical examination of the applicant. To admit the commission's claim in this respect would be to sustain an award on the basis of evidence that is not in the record, and to put beyond the reach of a judicial review a large number of cases in which by any ordinary process of reasoning there is no evidence to sustain the commission, but in which the commission asserts that because of some undisclosed knowledge on its part, or its experience and skill in drawing inferences, the fact has been established. It is our conclusion that such a view cannot be sustained." *F. A. McDonald Co. v. Industrial Comm., supra* (p. 138).

*By the Court.*—Judgment reversed and cause remanded with directions to enter judgment setting aside the award and remanding the record to the Industrial Commission for further proceedings.

CURRIE, J. (*dissenting*). While the findings of the commission do not state the nature of the employee's disability, it did make the finding of ultimate fact that the disability found resulted from the industrial injury sustained by the employee on September 18, 1945, during the course of his employment by the employer. Correspondence in the commission's files, however, indicates that appellants are correct in their assumption that the commission considered the disability to be the result of traumatic neurosis.

Traumatic neurosis whereby the injured person has an honest, fixed, definite, and continuing belief that he is suffering pain or other physical disability as the result of an accident, when in reality there is no pathological basis for such belief, is just as disabling as if he were actually suffering the

pain or disability he thinks he is. That disability due to traumatic neurosis is compensable under workmen's compensation acts is fully established by the following extract from sec. 42.22, 1 Law of Workmen's Compensation, published in 1952, the author of which text is Arthur Larson, a member of the Wisconsin bar and presently a professor of law at the Cornell Law School (p. 616) :

"Conversely, when there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis or hysterical paralysis, it is now uniformly held that the full disability including the effects of the neurosis is compensable. Dozens of cases, involving almost every conceivable kind of neurotic or hysterical symptom, have accepted this rule. Those denying compensation will usually be found to have done so not on the theory that traumatic neurosis is not compensable as such, but on the ground that the evidence failed to establish a causal connection between the injury and the neurosis. Thus, compensation has been awarded when, after all the physical effects of a fall of rock on claimant's shoulder had cleared up, complete paralysis of one arm remained, which was attributed entirely to hysteria. The same result was reached when a woman got an electric shock in her arm while ironing, and lost the use of the arm due to a neurotic condition. As in other connections, a preexisting weakness in the form of a neurotic tendency does not lessen the compensability of an injury which precipitates a disabling neurosis."

A typical case holding traumatic neurosis to be compensable is *United States Fuel Co. v. Industrial Comm.* (1924), 313 Ill. 590, 145 N. E. 122, wherein the supreme court of Illinois upheld an award of compensation of the Illinois industrial commission, and we quote from the opinion in that case as follows (p. 593) :

"The evidence in the record as above detailed supports the finding of the Industrial Commission that the defendant in error suffered an accident which has caused total and permanent incapacity for work. It is immaterial whether this condition is caused by a physical injury or a mental disorder

resulting from the injury. *Where an employee has an honest, fixed, definite, and continuing belief that he is suffering severe bodily pain, and that he is in such a disordered condition that he is unable to work and walks in a very stooped position, as does defendant in error, and all of the foregoing conditions have been brought about by a severe accidental injury, he is as much entitled to compensation as if he were in fact totally and permanently disabled by such accidental injury.* As serious ailments as any which physicians have to contend with are fanciful diseases and disorders of the mind, which put the patient beyond the control of the physician in the use or employment of his medical science, whether that medical science be by the use of drugs and medicine, or by manipulation of the various parts of the body, or by the employment of Christian Science, or similar methods of healing. Such mental disease or disorder may not only render the subject thereof totally disabled for work but such condition may also be permanent. The record evidence in this case supports the finding that the disorder, of whatever character it may be, mental or physical, has rendered the defendant in error totally and permanently incapacitated for work." (Emphasis supplied.)

In the instant case the expert evidence on the part of physicians discloses that there is no pathological reason why the employee has not been able to work since the completion of the healing period following the injury in 1945. Prior to the accident for many years, although a neurotic, he had been gainfully employed. Since December 5, 1946, he has not been. The employee attributes his inability to work in industry to disability received resulting from the accident. There seems to be but two possible explanations for this, viz., either he is malingering, or he is suffering from traumatic neurosis. The issue on this appeal is whether there is any credible evidence, which, if unexplained, would warrant the commission in making the finding of disability due to the injury. *Hills Dry Goods Co. v. Industrial Comm.* (1935), 217 Wis. 76, 85, 258 N. W. 336; and *Motor Transport Co. v. Public Service Comm.* (1953), ante, pp. 31, 46, 56 N. W. (2d) 548.

The two medical reports of Dr. Mabel G. Masten, a specialist in the field of psychiatry and a member of the faculty of the University of Wisconsin Medical School, do provide such competent credible evidence to sustain the finding of disability by the commission. The fact that Drs. Wirka and Hurley expressed opinions that the employee was a malingerer merely serves to contradict the expert opinion evidence of Dr. Masten, and not to explain it away. Such conflict presents a question as to the weight of the evidence. This court, in reviewing findings of fact by the Industrial Commission, has no right to weigh the evidence as that function is exclusively within the province of the commission. *Hills Dry Goods Co. v. Industrial Comm., supra.*

Sec. 102.17 (1) (c), Stats., empowers the commission "whenever the testimony presented at any hearing indicates a dispute, or is such as to create doubt, as to the extent or cause of disability" to direct that the injured employee be examined "by an impartial, competent physician designated by the commission," and that the report of such examination shall be transmitted in writing to the commission, it being clearly implied by the statute that such report shall constitute evidence upon which the commission may base a finding. Pursuant to this statute, the commission directed that the injured employee be examined by Dr. Masten as such impartial, competent physician, and the two written reports of her findings and conclusions commented upon in the majority opinion were furnished by her to the commission as a result of examinations made by her of the employee at such request of the commission.

In Dr. Masten's first report of 1947, she stated: "I must admit, however, that the negative X-ray findings and the poor personality structure *favors a diagnosis of psychoneurotic reaction to trauma.*" I would interpret this statement as meaning that Dr. Masten was of the opinion that the diagnosis of psychoneurotic reaction to trauma was in accord with

the medical probabilities, and not, as does the majority opin-
ion, that such diagnosis is merely a possibility. The use of
the word *"favors"* indicates something stronger than mere
possibility. Webster's New International Dictionary (2d
ed.), gives as synonyms for the verb *"favor"* the words *"up-
hold"* and *"support."* If such quoted statement by Dr. Masten
from her first report is subject to be fairly interpreted as
being her opinion that the medical probabilities (and not
merely the medical possibilities) support a diagnosis of psy-
choneurotic reaction to trauma (traumatic neurosis), this
expert opinion evidence would alone be sufficient to support
the finding of the commission.

Probably the leading Wisconsin case dealing with ex-
pert medical opinion testimony is that of *Hallum v. Omro*
(1904), 122 Wis. 337, 99 N. W. 1051. In the opinion in
that case Mr. Justice MARSHALL stated (pp. 341, 344):

> "The doctor, having knowledge as to what respondent tes-
> tified respecting her condition before and after the accident,
> was asked, upon the hypothesis that her testimony was true,
> whether the injuries she was suffering from 'were liable to be
> permanent.' It is strenuously insisted that such testimony
> was conjectural and was erroneously received, under the doc-
> trine of *Viellesse v. Green Bay*, 110 Wis. 160, 85 N. W. 665.
> True, there can be no recovery, legitimately, for permanent
> impairment in a case like this in the absence of competent
> evidence warranting a conclusion, with reasonable certainty,
> that such impairment will exist as a result of the accident; but
> it is not necessary that opinion evidence should be confined
> to that high degree of certainty. Experts may properly testify
> to the mere probabilities of the case. . . .
> *"An examination of the cases cited will show that 'proba-
> ble,' 'likely,' and 'liable' have been treated as synonymous,
> each dealing with reasonable probability, not with possibility,
> and that what may probably or is likely or liable to be the
> future result of a personal injury is competent evidence to
> prove what is reasonably certain in the matter.* That is ac-
> cording to lexical authority as to the meaning of the words.
> *The better way, we should say, to invoke professional opinion*

*evidence in such a matter, is to ask for the expert's opinion, not using either term. But an interrogatory as to what the probabilities are, or what is likely or liable to be the result as regards permanency of the injury cannot be condemned as speculative or conjectural.* This does not militate at all against the doctrine that the ultimate vital fact to be determined is what is reasonably certain to be the result. That is for the jury to determine from all the evidence bearing on the question, including the opinion evidence as to what is probable, likely, or liable to be the case." (Emphasis supplied.)

*Hallum v. Omro, supra,* has been cited in many subsequent decisions by this court as setting forth the proper criteria for expert medical testimony. A recent case so citing it is that of *McCauley v. Balsley* (1943), 242 Wis. 528, 533, 8 N. W. (2d) 299, the opinion in which case was written by Mr. Justice FAIRCHILD.

In *Faber v. C. Reiss Coal Co.* (1905), 124 Wis. 554, 561, 102 N. W. 1049, this court approved questions put to a physician "to ascertain whether or not the injuries to the skull" were "likely to result in recurrent troubles" or "were apt to affect injuriously the other eye," on the ground that they "were framed to elicit the probabilities of future suffering as consequences of existing conditions," and therefore proper.

The sufficiency of expert medical testimony was before this court in the case of *Vilter Mfg. Co. v. Industrial Comm.* (1927), 192 Wis. 362, 365, 212 N. W. 641, and we quote therefrom as follows:

"Since we are not called upon to weigh the probabilities for or against the finding of the commission, but only to ascertain whether or not there is competent testimony to sustain it, no effort has been made to set out all the details of the evidence for or against the commission's finding. The ultimate question we have to answer is, Can a finding rest upon a preponderance of probabilities? The assertion is made by plaintiffs that the finding is only a guess and that it must

amount to a reasonable certainty. That a finding or verdict must amount to a reasonable certainty is the law. That brings us to the question stated somewhat differently, Can a finding to a reasonable certainty be based upon evidence which shows only a preponderance of probabilities?

"Fortunately our court has dealt with this question several times. In *Hallum v. Omro,* 122 Wis. 337, 99 N. W. 1051, the court says: [quoting from the portions of the opinion in the latter case hereinbefore set forth]."

This court in the case of *Pfister & Vogel L. Co. v. Industrial Comm.* (1927), 194 Wis. 131, 215 N. W. 815, affirmed an award of the Industrial Commission in a workmen's compensation case wherein the commission found that the death of an employee in a tannery was caused by an infection of the liver by the actinomycosis germ or fungus as a result of exposure to such germ or fungus during the course of employment in the tannery. In its opinion the court stated (p. 133):

"The physicians called by the applicant testified that *it was more probable* that the disease was contracted in the tannery than anywhere else, and that the *probabilities* are all to the effect that the deceased was infected with the germ in the tannery.

"It is often impossible to find the source from which a germ-causing disease has come. The germ leaves no trail that can be followed. Proof often does not pass beyond the stage of possibilities or probabilities, because no one can testify positively to the source from which the germ came, as can be done in the case of physical facts which may be observed and concerning which witnesses can acquire positive knowledge. Under such circumstances the Industrial Commission or the court can base its findings upon a preponderance of probabilities or of the inferences that may be drawn from established facts." (Emphasis supplied.)

Mr. Justice WICKHEM, speaking for the court in the opinion in *Ramsay v. Biemert* (1935), 216 Wis. 631, 636, 258 N. W. 355, stated:

"The medical evidence sustains the view that the stiffness of the ankle and the present permanent impairment of plaintiff's foot is the result of the accident here involved. While the experts testify that the accident of May 5th might have been the exciting cause, *they testify that the probabilities are that the accident in suit here was responsible.* In *Hallum v. Omro,* 122 Wis. 337, 99 N. W. 1051, it was held that '*experts may properly testify to the mere probabilities of the case.*' In *Vilter Mfg. Co. v. Industrial Comm.* 192 Wis. 362, 212 N. W. 641, it was held that a finding may rest upon a preponderance of probabilities. Since the field is one of science where expert testimony is admissible, and since the medical experts testify to the probability that the accident of September 25th was the cause of permanent stiffness in the ankle, it must be held that the jury's award is sustained by the evidence." (Emphasis supplied.)

The foregoing authorities make it amply clear that Dr. Masten's opinion, if correctly interpreted to mean that medical probabilities indicated a diagnosis of psychoneurotic reaction to trauma, was in itself sufficient competent evidence to support the finding of the commission in the instant case. However, there is in evidence the second written medical report of Dr. Masten, dated January 29, 1951, in which she stated:

"The accident has provided a defense against facing the demands of reality. There may be some degree of malingering. This commonly exists in many psychoneurotic traumatic reactions, *but primarily his condition is the result of personality disorder and neurotic behavior beyond his understanding.*" (Emphasis supplied.)

When Dr. Masten stated as her opinion that the employee's neurotic behavior is *"beyond his understanding,"* this negatives the hypothesis that his disability is entirely due to conscious malingering on his part and is further competent credible evidence to sustain the finding of the commission that the disability was due to traumatic neurosis.

The fact, that without the underlying personality disorder traumatic neurosis would not have occurred, is immaterial so far as the liability of the employer is concerned. In *Farran v. Curtis Publishing Co.* (1923), 276 Pa. 553, 555, 120 Atl. 544, the Pennsylvania supreme court upheld the findings and award of the Pennsylvania workmen's compensation board in which findings the board stated with respect to the applicant employee:

" '. . . that she is not a malingerer, and that while she, by nature, is of a neurotic condition, nevertheless the accident has so aggravated this original condition as to bring about a great disturbance in her digestive organs and produce loss in weight.' "

The rule is that an employer takes an employee as he finds him with such predispositions and weaknesses which he may have that may make him more susceptible to injuries. As stated by this court in *General A. F. & L. Assur. Corp. v. Industrial Comm.* (1937), 223 Wis. 635, 652, 271 N. W. 385:

"This court has frequently found that the fact that there was a pre-existing physical condition without which there would not have been serious injury is immaterial. *Milwaukee v. Industrial Comm.* 160 Wis. 238, 151 N. W. 247; *Milwaukee E. R. & L. Co. v. Industrial Comm.* 212 Wis. 227, 247 N. W. 841; *Employers Mut. L. Ins. Co. v. Industrial Comm.* 212 Wis. 669, 250 N. W. 758; *Malleable Iron Range Co. v. Industrial Comm.* 215 Wis. 560, 255 N. W. 123."

There would appear to be no sound basis for any distinction between disabling *physical* and disabling *mental* effects of an industrial accident. If, because of a pre-existing mental condition an industrial accident renders an employee unable to work, the resulting disability is chargeable to the employer, notwithstanding the disappearance of the physical symptoms.

It is unfortunate that Dr. Masten so stated her conclusions in her two written reports to the commission as to cause the

members of this court to disagree as to the proper interpretation to be placed on such conclusions. Such a result would be avoided in the future if the commission, when it requests an examination of the employee by an independent impartial physician of its own choice, pursuant to sec. 102.17 (1) (c), Stats., would inform such physician that the written report of such examination containing the doctor's conclusions will constitute evidence in the case, and therefore any such conclusions should be stated to be based upon either medical probabilities or medical certainty, if the doctor in good conscience finds that he (or she) is possessed of such an opinion after making the examination of the employee.

Inasmuch as it is my opinion that there was credible competent evidence to sustain the finding with respect to disability made by the commission, I would affirm the judgment.